# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| BRET BRAY, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>LATHEM TIME CO.,<br><br>    Defendant. | Case No. 1:22-cv-01748-JPB<br><br>Judge J. P. Boulee |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT LATHEM TIME CORP.'S RULE 12(B)(6) MOTION TO DISMISS

{10365580:3 }

Defendant Lathem Time Corporation[1] ("Lathem") submits this memorandum of law in support of its Motion to Dismiss (the "Motion").

## I. INTRODUCTION

This is a lawsuit for alleged violations of the Illinois Biometric Information Privacy Act, 740 ILCS 14/1, *et seq.* ("BIPA"). Plaintiff Bret Bray ("Bray") alleges that his former employer, Hixson Lumber Sales of Illinois, Inc. ("Hixson"), required him to use Lathem facial-recognition technology on a timekeeping device (a "Lathem Device"), and that *Lathem* – with which he has no relationship – violated BIPA by collecting and storing his biometric data without giving the notices and obtaining the consents required by the statute. Plaintiff seeks to pursue these claims for himself and any individual in Illinois who supposedly had their facial geometries collected, captured, received, or stored by Lathem, regardless of where they worked.

This is Bray's third BIPA suit arising out of his brief employment at Hixson, and it should be his last. Bray unconditionally released his claims against Lathem when he settled a separate BIPA lawsuit against Hixson last year. Even if not for that threshold issue, Bray fails to state a claim against Lathem for the alleged collection of his biometrics. His claims therefore should be dismissed with prejudice.

---

[1] The Complaint (Dkt. No. 1-2) incorrectly identifies Lathem as a company.

## II. BACKGROUND

### A. Illinois' Biometric Information Privacy Act

BIPA regulates the collection, storage, and disclosure of Illinois residents' "biometric identifiers" and "biometric information" 740 ILCS § 14/5. "Biometric identifiers" include retina and iris scans, fingerprints, voiceprints, and scans of the hands and face geometry; and "biometric information" is information based on those identifiers. *Id.* § 14/10. BIPA does not prohibit the collection and use of biometrics, but it does: (1) set forth certain requirements with which "private entities" must comply before collecting biometric information; (2) require entities that possess biometric data to maintain certain storage, retention, and transparency standards; and (3) prohibit the sale or unauthorized disclosure of biometric data. *See* 740 *id.* § 14/15.

This case implicates Sections 15(a) and 15(b) of BIPA. Section 15(a) provides that a "private entity in possession of biometric identifiers or biometric information" must develop a written, publicly available policy establishing a retention schedule and guidelines for the destruction of biometrics. *Id.* § 15 (a). And Section 15(b) provides that a private entity collecting biometrics must give written notice to, and get written consent from, individuals whose biometrics are collected. *Id.* § 15(b).

B. **Lathem Time Corporation**

Lathem is incorporated and headquartered in Georgia. (Compl. ¶¶ 14-15.) Bray describes Lathem as a "provider of human resource management software and services" that helps businesses track employee time and process payroll. (*Id.*) Certain Lathem Devices make use of biometrics – including, as is relevant here, scans of facial geometry – to validate employee identities. (*See id.* ¶¶ 2, 31.)

C. **Bret Bray**

Bray worked for Hixson in Hillsboro, Illinois for a few months in early 2019. (*Id.* ¶ 40.)[2] He claims that "[a]s a condition of employment with Hixon (sic), [he] was required to scan his facial geometry using a Lathem device so his employer [Hixson] could track his time," (*id.* ¶ 41), and that "Lathem subsequently stored [his] facial biometric data in its database(s)," (*id.* ¶ 42).

Bray does not claim to have had any relationship or dealings with Lathem at all during his stint with Hixson. Nevertheless, he alleges that Lathem violated BIPA: (1) Section 15(a) by failing to develop and adhere to a publicly available retention schedule and guidelines for destroying biometrics, (*id.* ¶ 71); and (2) Section 15(b) by failing to give and get the required written notices and consents, (*id.* ¶¶ 81-82).

---

[2] Bray incorrectly identifies Hixson as "Hixon Lumber Supply." (*Id.* ¶ 40.)

### D. The State Court Lawsuits

On April 22, 2019, Bray filed two class-action lawsuits in Illinois state court: one against Lathem, *id.* at 1, and the other against Hixson, *see* Compl., *Bray v. Hixson Lumber Sales of Ill., Inc.*, No. 2019L9 (Cir. Ct. for Montgomery Cnty., Ill., filed Apr. 22, 2019) (attached hereto as **Exhibit A**).[3] In both cases, Bray asserted claims under BIPA based on Hixson's requirement that he use a biometric timekeeping device supplied by Lathem – which he candidly described in the *Hixson* complaint as the "vendor" at issue. (*See* Compl. at 1); Ex. A at 1 & ¶ 32.

Lathem removed its case to the U.S. District Court for the Central District of Illinois. (Compl. at 1.) On March 27, 2020, the court dismissed the case for lack of personal jurisdiction. (*Id.*) A few days later, on April 6, 2020, Bray refiled his claim against Lathem in the Superior Court of Cobb County, Georgia. (*Id.*) The case then sat idle for two years until April 4, 2022, when Bray served Lathem with process.

### E. The *Hixson* Settlement and Release

While the case against Lathem was dormant in Cobb County, Bray negotiated a class-wide settlement of the *Hixson* case in Illinois (the "Settlement Agreement"),

---

[3] This Court may take judicial notice of state court filings. *See infra* § IV.A.1.

a copy of which is included in **Exhibit B** hereto.[4] The Settlement Agreement includes a broad release of all claims related to the use of Lathem Devices (the "Release"), pursuant to which Bray and the settlement class:

> released . . . and discharged the Released Parties from all actual, potential, filed, unfiled, known or unknown, . . . claims, demands, liabilities, rights, causes of action, . . . damages, . . . attorneys' fees and/or obligations, whether in law or in equity, . . . of every nature and description whatsoever, whether based on [BIPA] or any other federal, state, local, statutory or common law or any other law, including the law of any jurisdiction outside the United States, from the beginning of the world to the date hereof, including but not limited to all claims which were made or could have been made by [Bray] in this Action.

Ex. B, at Ex. 1 ¶ 3.1. And importantly, the Release encompassed a wide range of "Released Parties" – including Hixson and its "vendors." *Id.* ¶ 1.18.

On August 20, 2021, the *Hixson* court granted final approval to the settlement in that case. *See* Final Order & Judgment, *Hixson Lumber Sales*, No. 2019L9 (Cir. Ct. for Montgomery Cnty., Ill., Aug. 20, 2021) (attached hereto as **Exhibit C**) (the "*Hixson* Final Order"). The *Hixson* Final Order gave effect to the Release by:

---

[4] The Settlement Agreement, styled "Stipulation of Class Action Settlement," is Exhibit 1 to the *Hixson* Plaintiffs' Unopposed Motion and Memorandum in Support of Preliminary Approval of Class Action Settlement (filed Apr. 27, 2021), which is attached hereto as Exhibit B. To reduce the size of Exhibit B, Lathem has omitted the exhibits to the Settlement Agreement but can submit them upon request.

{10365580:3}  5

- deeming all settlement class members, including Bray, "to have fully, finally, and forever released, relinquished, and discharged all Released Claims . . ., as defined under the Settlement Agreement," *id.* ¶ 15;

- holding "the Settlement Agreement and the above-described release of the Released Claims will be binding on, and have *res judicata* preclusive effect in, all pending and future lawsuits or other proceedings maintained by or on behalf of Plaintiffs and all other Settlement Class Members," *id.* ¶ 17;

- explaining the Released Parties "may file the Settlement Agreement and/or [the *Hixson* Final Order] in any action or proceeding that may be brought against them in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim," *id.*; and

- ordering "Plaintiffs" – which included Bray – "and Settlement Class Members . . . are permanently barred and enjoined from asserting, commencing, prosecuting, or continuing any of the Released Claims or any of the claims described in the Settlement Agreement against any of the Released Parties," *id.* ¶ 18 – which included Hixson and its vendors.

### III.  LEGAL STANDARD

In evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court "accept[s] the allegations in the complaint as true and constru[es] them in the light most favorable to the plaintiff." *Traylor v. P'ship Title Co., LLC*, 491 F.App'x 988, 989 (11th Cir. 2012). A "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). Thus, to survive a motion under

Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). A complaint is plausible on its face when it pleads enough facts to support a reasonable inference that the defendant is liable for the alleged conduct. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010).

## IV. ARGUMENT

### A. Bray Released His Claims Against Lathem.

Where a contract clearly shows a party's intent to settle and release his or her claims, the release is complete and effective, and no further factual inquiry is appropriate. *See Kobatake v. E.I. DuPont De Nemours & Co.*, 162 F.3d 619, 624 (11th Cir. 1998) (affirming dismissal based on a release). The effect of a prior release can be decided on a motion to dismiss. *See id.*; *see also In re Wright Med. Tech. Inc., Conserve Hip Implant Prod. Liab. Litig.*, No. 1:16-CV-3044-WSD, 2017 WL 1178082, at *3-4 (N.D. Ga. Mar. 29, 2017) (dismissing claim based on a release).

Such is the case here, where: (1) this Court can take judicial notice of the Release from *Hixson*; and (2) Bray clearly released his claims against Lathem.

### 1.     This Court can take judicial notice of the Release from *Hixson*.

"Courts may take judicial notice of publicly filed documents, such as those in state court litigation, at the Rule 12(b)(6) stage." *U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811-12 n.4 (11th Cir. 2015); *see also* Fed. R. Evid. 201(b); *Lozman v. City of Riviera Beach, Fla.*, 713 F.3d 1066, 1075 n.9 (11th Cir. 2013) ("Although this matter is before the court on a motion to dismiss, we may take judicial notice of the court documents from the state eviction action.").

Here, the documents attached to Lathem's Motion to Dismiss – including the *Hixson* complaint, the *Hixson* Settlement Agreement, and the *Hixson* Final Order – were all filed in the Circuit Court for Montgomery County, Illinois. Exs. A-C. As such, they are publicly available, and their authenticity is beyond reasonable dispute. Accordingly, the Court may take judicial notice of and consider them here.

Even if the Eleventh Circuit did not allow for judicial notice of the publicly filed and available Release, which it expressly does, the result would be the same were the Court to convert this Motion into one for summary judgment. *Wright Med. Tech.*, 2017 WL 1178082, at *2 n.1 ("Even if the Court converted the Motion to Dismiss into a motion for summary judgment, [it] would reach the same result, relying only on the plain language of the Release.").

The U.S. District Court for the Northern District of Illinois recently did exactly that in *Osborne v. WeWork Companies, Inc.*, No. 1:19-CV-08374, 2022 WL 972320 (N.D. Ill. Mar. 31, 2022). In *Osborne*, the defendant moved to dismiss BIPA claims on the basis of a settlement and release agreement from a related lawsuit against the defendant's biometric-identification service "vendor." *Id.* at *1-3, *5. The defendant moved under Rule 12(b)(1), but the court concluded that a release defense is better raised under Rule 12(c), and further that because the motion relied on material outside the pleadings (the settlement agreement at issue), it should be reviewed under Rule 56. *Id.* at *3.[5] With that context, and faced with "unambiguous" definitions of "Released Parties" and "Settled Claims" that "broadly and clearly" covered the defendant, the *Osborne* court readily concluded no genuine dispute of material fact existed that the plaintiff's claims had been released and that summary judgment therefore was appropriate. *Id.* at *4-5.

The same is true here; even under a summary judgment standard, Bray's claims fail as a matter of law. As explained below, the Release broadly and clearly covers Lathem, and no genuine dispute of material fact exists as to its meaning.

---

[5] The *Osborne* decision is silent as to the issue of judicial notice. Here, the Eleventh Circuit has confirmed that state-court filings are subject to judicial notice.

### 2. Bray clearly released his BIPA claims against Lathem.

The *Hixson* Settlement Agreement must be interpreted under Illinois law. Ex. B, at Ex. 1 ¶ 10.16. In Illinois, a "release is a contract, and therefore is governed by contract law." *Farm Credit Bank of St. Louis v. Whitlock*, 581 N.E.2d 664, 667 (Ill. 1991). "Illinois uses in general a four corners rule in the interpretation of contracts," such "that if the language of a contract appears to admit of only one interpretation, the case is indeed over." *Platinum Supplemental Ins., Inc. v. Guarantee Tr. Life Ins. Co.*, 989 F.3d 556, 563 (7th Cir. 2021) (internal quotations omitted). In other words, "[w]here a written agreement is clear and explicit, a court must enforce the agreement as written." *Rakowski v. Lucente*, 472 N.E.2d 791, 794 (Ill. 1984).

Similarly, "[i]f the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning." *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011). Thus, the "plain, ordinary and popular meaning of . . . broad, unqualified language [in a] release entails a broad, unqualified release of claims." *Platinum Supplemental*, 989 F.3d at 564 (internal quotations omitted). The determination of whether a particular claim has been released under such an agreement is not a "question of interpretation or ambiguity . . . but rather one of the appropriate application of this otherwise clear language." *Id*. To impose narrowing

constructions on a "release [that] is comprehensive, precise, and unambiguous" would "detract[] from its broad and general scope." *Rakowski*, 472 N.E.2d at 794.

In *Rakowski*, the Illinois Supreme Court recognized the import of "comprehensive language" in releases, where it considered a release encompassing:

> any and all claims, demands, damages, actions, causes of action or suits of any kind or nature . . . and particularly on account of all injuries, known and unknown . . . which have resulted or may in the future develop from an accident which occurred.

472 N.E.2d at 794 (alterations in original). The Court concluded that broad language does not contemplate any exception or preservation of claims, unless the claims to be retained are "clearly specif[ied]." *Id.* (quotation omitted). Similarly, applying Illinois law, the Seventh Circuit has held that a release covering "all claims that were filed or could have been filed" was "clear and explicit," meant "precisely what it [said]," and was case-determinative. *Platinum Supplemental*, 989 F.3d at 564.

As in *Rakowski*, *Platinum Supplemental*, and countless other cases, the Release here is clear, unqualified, and susceptible to only one meaning. Bray "released, relinquished, and discharged" the Released Parties from "all actual, potential, filed, unfiled, known or unknown . . . claims, demands, liabilities, rights, [and] causes of action" from "the beginning of the world" to the present, "including but not limited to all claims which were made or could have been made by" him. Ex.

B, at Ex. 1 ¶ 3.1. That sweeping and unconditional language does not carve out any claims – much less with the specificity required to preserve an action under Illinois law. *Rakowski*, 472 N.E.2d at 794. On the contrary, the Release was drafted to capture *all* claims, filed or unfiled, based on any law, wherever pending.

Nor does the Release qualify or limit the scope of the Released Parties. *See* Ex. B, at Ex. 1 ¶ 1.18. Instead, it extends that definition well beyond Hixson to encompass a vast array – in fact, almost *50 different categories* – of individuals and entities associated with Hixson, including its "vendors." *Id*. And Bray cannot dispute Lathem is the vendor of the *very* device at the core of his claims. After all, he alleges that Lathem encourages its "customers" to use biometric clocks, (Compl. ¶ 2), and that Hixson required him to "scan his facial geometry using a Lathem device," (*id.* ¶ 41). And tellingly, "vendor" is exactly how he described Lathem in the *Hixson* complaint, Ex. A ¶ 32 – years before he agreed to include that term in the Release.

The *Hixson* Final Order, in turn, gave unyielding effect to the expansive scope of the Release. Indeed, the *Hixson* Final Order – which, on its face shows that it was "proposed" by the parties, and likely was submitted by Bray to the court with his motion for final approval of the Settlement Agreement – explicitly held:

- Bray released the Released Parties from the Released Claims, Ex. C ¶ 15;
- the Release was to be binding on, and had "preclusive effect in, *all pending and future lawsuits*" by Bray, *id.* ¶ 17 (emphasis added);

{10365580:3}                                  12

- the Released Parties could file the Settlement Agreement and the *Hixson* Final Order "in any action" in support of a "release" defense, *id.*; and

- Bray was "permanently barred and enjoined from asserting, commencing, prosecuting, or *continuing* any of the Released Claims . . . against any of the Released Parties," *id.* ¶ 18 (emphasis added).

No ambiguity, uncertainty, or exceptions exist in any of these filings – which Bray himself negotiated, agreed to, and submitted to the *Hixson* court. And the documents could not be clearer: Bray released all BIPA claims arising from his time at Hixson – including all "filed" and "pending" lawsuits, which plainly encompasses this case.

The Release must be enforced as written because it is unambiguous and susceptible to only one meaning: Bray released his claims against Lathem. "[N]o grounds at law or in the contract itself exist to open" the issue to factual inquiry, *Kobatake*, 162 F.3d at 624 & n.4, and "the case is indeed over." *Platinum Supplemental*, 989 F.3d at 563. Bray's claims should be dismissed with prejudice.

## B. Count II of Bray's Complaint Fails to State a Claim Because Bray Does Not Allege Lathem Actively Obtained His Biometrics.

Even if Bray had not released his claims, Count II still should be dismissed because: (1) BIPA Section 15(b) applies only to the active collection of biometrics; and (2) Bray fails to allege facts showing Lathem actively collected his biometrics.

1.  **Section 15(b) applies only to the active collection of biometrics.**

Many of BIPA's provisions apply to the mere "possession" of biometrics. *See* 740 ILCS § 14/15(a), (c)-(e) (regulating entities "in possession of" biometric data). But Section 15(b) is different. It omits the mere possession as a regulated activity. Instead, it imposes obligations only on entities that "collect, capture, purchase, receive through trade, or otherwise obtain" biometrics. 740 ILCS § 14/15(b).

The distinction is meaningful. "When the [Illinois] legislature uses certain language in one part of a statute and different language in another, [courts] may assume different meanings were intended." *Carver v. Bond/Fayette/Effingham Reg'l Bd. of Sch. Trustees*, 586 N.E.2d 1273, 1276 (Ill. 1992). Those different meanings are apparent here. To "possess" a thing is a passive undertaking; it means only "to have or to own something," irrespective of how. *Possess*, CAMBRIDGE DICTIONARY.[6] In contrast, to "collect," "capture," "purchase," or "trade" all involve a purposeful or active undertaking. *See Collect*, CAMBRIDGE DICTIONARY (meaning "to bring something together from difference places").[7] Similarly, to "obtain" a thing involves

---

[6]   https://dictionary.cambridge.org/us/dictionary/english/possess (last accessed May 24, 2022).

[7]   https://dictionary.cambridge.org/us/dictionary/english/collect (last accessed May 24, 2022).

affirmative and directed action. *See Obtain*, BLACK'S LAW DICTIONARY 1247 (11th ed. 2019) ("[t]o bring into one's own possession; to procure, esp. through effort").

Recognizing this distinction, courts have concluded that "for Section 15(b)'s requirements to apply, an entity must, at a minimum, take an active step to collect, capture, purchase, or otherwise obtain biometric data." *Jacobs v. Hanwha Techwin Am., Inc.*, No. 1:21-cv-866, 2021 WL 3172967, at *2 (N.D. Ill. July 27, 2021); *see also Heard v. Becton, Dickinson & Co.*, 440 F. Supp. 3d 960, 966 (N.D. Ill. 2020) (same); *Namuwonge v. Kronos, Inc.*, 418 F. Supp. 3d 279, 286 (N.D. Ill. 2019) (noting "difference between *possessing* and *collecting* biometric information").[8]

### 2. Bray fails to allege facts showing that Lathem actively collected his biometrics identifiers or information.

Bray falls short of alleging a violation of Section 15(b). Although he makes a passing reference to Lathem's "collection" of his biometric data, (Compl. ¶ 78), the mere "recitation of the elements of a cause of action" does not satisfy his obligation

---

[8] This distinction makes sense. "Statutes are to be construed in a manner that avoids absurd or unjust results." *People v. Hanna*, 800 N.E.2d 1201, 1208 (Ill. 2003). Allowing mere possession of biometric data to trigger Section 15(b)'s requirements would be absurd because that section uniquely imposes requirements – such as the exchange of written notice and consent – that must be met before collection occurs, which would be difficult, if not impossible, to comply with where (as here) the entity charged with compliance is a third party to the collection and has no relationship or contact with the individuals whose biometrics are being obtained.

to "provide the grounds of his entitlement to relief." *Gilreath Fam.*, 522 F. Supp. 3d at 1283-84. Indeed, simply parroting "the element of a cause of action without additional factual support is not sufficient to state a claim"; Bray must provide "facts which would show how" the element in question was satisfied. *O'Neill v. Khuzami*, No. 1:20-CV-04632-JPB, 2022 WL 704696, at *2 (N.D. Ga. Mar. 9, 2022).

Tellingly, the only two *factual* allegations in the Complaint related to the supposed collection of Bray's biometric data do not indicate that Lathem had an active role in that process. *First*, Bray alleges that "[a]s a condition of employment with Hixon, Bray was required to scan his facial geometry using a Lathem device" "each time he clocked in for work and clocked out of work." (Compl. ¶¶ 41, 43.) And *second*, Bray alleges that "Lathem subsequently stored Bray's facial biometric data in its database(s)." (*Id.* ¶ 42.) The natural reading of these allegations, taken together, is that *Hixson* collected Bray's biometrics using a device that Lathem provided to Hixson, and that *after* that collection, Lathem came into possession of Bray's biometrics. That, however, does not support a claim under Section 15(b). *See*, *e.g.*, *Namuwonge*, 418 F. Supp. 3d at 286 (dismissing Section 15(b) claim that only alleged plaintiff's employer used a timekeeping system provided by defendant). Because Bray alleges only possession, not active collection, by Lathem, his claim under Section 15(b) fails as a matter of law and must be dismissed.

## V. CONCLUSION

For the reasons set forth above, Lathem respectfully requests that the Court: (a) grant this Motion; (b) dismiss Bray's Complaint with prejudice; and (c) award Lathem such other and further relief as is appropriate.

Respectfully submitted this 24th day of May, 2022.

Respectfully submitted,

**LATHEM TIME CORP.**

*/s/ Christopher G. Dean*
One of its attorneys

Christopher G. Dean (admitted *pro hac vice*)
MCDONALD HOPKINS LLC
600 Superior Ave., E, Ste. 2100
Cleveland, Ohio 44114
Tel: (216) 348-5400
*cdean@mcdonaldhopkins.com*

Nick P. Panayotopoulos
Georgia Bar No. 560679
WEINBERG, WHEELER, HUDGINS,
GUNN & DIAL, LLC
3344 Peachtree Road, NE, Suite 2400
Atlanta, Georgia 30326
Tel: (404) 876-2700
Fax: (404) 875-9433
*npanayo@wwhgd.com*

*Attorneys for Defendant*

## RULE 7.1D CERTIFICATE OF TYPE, FORMAT AND FONT SIZE

Pursuant to Local Rule 7.1D of the U.S. District Court of the Northern District of Georgia, the undersigned certifies that the foregoing submission to the Court was computer-processed, double-spaced between lines, and used Times New Roman font of 14 point size.

*/s/ Christopher G. Dean*

Christopher G. Dean (admitted *pro hac vice*)
MCDONALD HOPKINS LLC
600 Superior Avenue, Suite 2100
Cleveland, Ohio 44114
Tel: (216) 348-5400
Fax: (216) 348-5474
*cdean@mcdonaldhopkins.com*

Nick P. Panayotopoulos
Georgia Bar No. 560679
WEINBERG, WHEELER, HUDGINS,
GUNN & DIAL, LLC
3344 Peachtree Road, NE, Suite 2400
Atlanta, Georgia 30326
Tel: (404) 876-2700
Fax: (404) 875-9433
*npanayo@wwhgd.com*

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the within and foregoing by electronically filing the same with the Court via the CM/ECF system, which will provide notice to all counsel of record.

Respectfully submitted this 24th day of May, 2022.

*/s/ Christopher G. Dean*

{10365580:2}